EDWARD P. SULLIVAN, Acting Chief
ALEXANDER GOTTFRIED, Trial Attorney (NY Bar No. 5490024)
Public Integrity Section, Criminal Division
U.S. Department of Justice
1301 New York Ave., NW
Washington, D.C. 20530
Telephone: 202-305-1746
Alexander.Gottfried@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>NICHOLAS KINDLE,<br><br>  Defendant. | Case No. 2:24-cr-422<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Judge Ann Marie McIff Allen<br><br>Sentencing Date: October 22, 2025 |

The United States of America, by and through its undersigned counsel, hereby files this Sentencing Memorandum for defendant Nicholas Kindle. The defendant was a Special Agent with Homeland Security Investigations (HSI) who violated his oath by conspiring to steal drugs that were in HSI's custody and put them back on the street by selling them for a profit. Considering the factors under 18 U.S.C § 3553(a), the government recommends that Kindle receive a sentence at the high end of the applicable advisory guideline range.

**I. Relevant Facts**

The investigation that led to the instant charges began in late October 2024, when the Federal Bureau of Investigation (FBI) received a report from an HSI confidential informant that the defendant and his co-conspirator, fellow HSI Special Agent David Cole, were requiring him to engage in acts he believed to be unlawful. PSR ¶ 10. The informant had begun performing work

for HSI agents, including the defendant, upon the informant's release from prison on drug charges in May 2023, initially assisting with what appeared to be legitimate HSI investigations. *See id.* But according to the informant, beginning in March or April 2024, Cole and the defendant initiated an arrangement in which the informant was required to purchase "bath salts"—an illegal controlled substance—from the conspirators at a price of $5,000 for 25 grams, with the understanding that the informant would resell the drugs on the street to addicts. *Id.* ¶ 11.

Over the next several months, the defendant and Cole engaged in a similar series of transactions with the informant once or twice a week. *Id.* ¶ 13. The defendant, who was the evidence custodian for HSI's Salt Lake City Field office, had access to bath salts and other drugs seized as part of legitimate law enforcement operations. *Id.* ¶ 12. Unlike when the informant engaged in legitimate work for the defendant, the agents did not appear to conduct any investigation related to these compelled drug transactions. *Id.* ¶ 13. They never equipped the informant with any recording devices, never asked the informant for specific information about the sales he made, and never attempted to arrest any of his customers. *Id.* The agents also insisted on using Signal, an encrypted messaging application, to communicate with the informant. *Id.* They even set their messages to disappear after a certain length of time, a marked contrast to typical evidence-gathering practices, which require preservation of such messages.

After receiving these allegations, the FBI began an operation to verify the informant's claims, conducting a series of eight controlled drug purchases between October 30 and December 2, 2024.[1] Three of these controlled purchases were directly with the defendant, while five were with Cole on behalf of both conspirators. The defendant personally met with the informant to

---

[1] These transactions are described more fully in paragraphs 14 through 51 of the PSR, which the government incorporates by reference in its recitation of the relevant facts.

conduct illegal drug transactions on October 30, November 18, and November 21. In each instance, the defendant would reach out to the informant via Signal one or two days prior to the meeting to arrange the transaction, providing the time and place. The latter two transactions were audio- and video- recorded by the informant with equipment provided by the FBI, while the October 30 exchange was only audio-recorded. Each interaction was accompanied by physical surveillance by law enforcement. On multiple occasions when Cole met with the informant, the defendant was observed by law enforcement meeting with Cole prior to the meeting to convey to him the drugs that Cole would subsequently sell to the informant.

During the first two transactions, the defendant directly conveyed the drugs to the informant in a container, such as a Styrofoam cup or paper McDonald's bag. During the November 21 meeting, the defendant provided the informant with a "dead drop" location inside a trash can from which he could receive the drugs. As captured in the FBI audio recordings, the defendant did not make any effort to investigate the informant's customers. However, the defendant did inquire about the quality of the new sample of bath salts he had provided the informant. When the informant said that the "people love it…it goes almost just as fast" as the older sample, the defendant responded, "[T]hat's good, man." The defendant also discussed his diminishing source of supply of drugs, saying "the original … not really running into it … I have to check … we have a little bit." This is consistent with the content of the recorded conversations that the informant was having with the defendant's co-conspirator, Cole.

Each controlled purchase involved Cole or the defendant providing the informant with approximately 25 grams of what later tested to be alpha-pyrrolidinohexanophenone (a/k/a Alpha-PHP or bath salts), a schedule I controlled substance. Beginning with the third controlled purchase on November 11, the conspirators also gave the informant an unknown white substance that FBI

3

testing could not conclusively identify. Cole initially gave the informant a free sample of the unknown substance to determine whether it was viable to sell in the illegal drug market by having the informant's customers try it. As seen from the conversation above, the conspirators continued to sell this substance to the informant when he represented that his drug customers were "loving" it. The sales of the unknown substance are not included in the drug quantity that the PSR attributes to the defendant.

On December 4 and 5, 2024, agents executed a series of warrants authorizing searches of Cole and Kindle as well as their residences, personal vehicles, personal cellular telephones, and HSI cubicles. During those searches, agents seized bath salts, more than $67,000 in currency, and other evidence. Following the searches, the government developed evidence that the defendant and Cole had begun selling bath salts stolen from HSI evidence as early as 2021, more than three years before the informant revealed the scheme. In addition to stealing evidence from their own investigations, he and Cole acquired additional bath salts through various ruses, including by falsely telling other law enforcement personnel that they needed bath salts to conduct legitimate HSI investigations. The defendant and Cole made use of multiple confidential informants as instruments of their scheme, selling bath salts to the informants and allowing them to resell the drugs on the street for a profit. The defendant and Cole made no effort to investigate the customers of their informants, and the sales did not serve any law enforcement purpose. Interviews with supervisors at the HSI Salt Lake City Field Office confirmed that Cole and Kindle's actions were unauthorized, contrary to agency policies, and unconnected with any legitimate HSI investigation.

## II. Sentencing Guidelines

As outlined in the PSR, Kindle's Total Offense Level is 21, and his Criminal History Category is I, resulting in a Guidelines range of 37-46 months. *See* PSR ¶¶ 70, 76, 103; ECF No.

21. Counts 1 and 2 of the Information group under U.S.S.G. § 3D1.2 because they involve the same acts and transactions and were part of a common scheme or plan. Specifically, the theft of the bath salts from government custody was a necessary component of the conspiracy to distribute and possess with the intent to distribute those drugs. Based on a converted drug weight of 340,860 grams (or 340.86 kilograms), converted from 891 grams of synthetic cathinones (bath salts), the base offense level for the combined offense is 24. *See* PSR ¶ 61; *see also* U.S.S.G. § 2D1.1(c)(8).

The drug weight was derived from (1) the bath salts recovered from the eight controlled purchases described above; (2) bath salts recovered during the December 4 searches; and (3) a conservative estimate of 25 grams of bath salts sold each week for 24 weeks leading up to the controlled purchases (based on information provided by the defendant and confidential informant). The drug weight does not account for the unknown substance that the conspirators supplied during the November controlled purchases, or Cole's solicitation of three kilograms of bath salts from an HSI Special Agent in Kentucky for the purpose of illegally redistributing them. Nor does it account for any of the bath salts that the defendant and Cole sold prior to 2024 using other informants.

The PSR appropriately applied a two-point offense-level increase for the defendant's role in the offense because he abused a position of public trust, namely his position as an HSI Special Agent. *See* PSR ¶ 64; U.S.S.G. § 3B1.3. His role as a law enforcement officer gave him and Cole access both to the bath salts they sold and to the confidential informants whom they employed to sell them. However, the defendant also qualifies for a two-point reduction due to his lack of criminal history. *See* PSR ¶ 67; U.S.S.G. § 4C1.1(a). And he accepted responsibility by timely notifying authorities of his intention to plead guilty, qualifying for a three-point reduction. *See*

PSR ¶¶ 68–69; U.S.S.G. § 3E1.1. The resulting Total Offense Level is 21, *see* PSR ¶ 68, prior to any other adjustment discussed in the government's sealed filing. *See* ECF No. 23.

### III. Discussion of Sentencing Factors

After calculating the Guidelines, the Court must consider the sentencing factors outlined in 18 U.S.C. § 3553(a). Among other things, the Court's sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to similar conduct by other potential offenders. *See id.* § 3553(a)(2). In this case, the sentence imposed must be significant enough to reflect the seriousness of the offense committed and achieve the purpose of sentencing. The government recommends a sentence at the high end of the applicable guideline range to strike the appropriate balance between these various competing factors.

*a. Nature and Circumstance of the Offense*

The defendant's offense was undoubtedly serious. The defendant used his badge to act as a common drug dealer, stealing bath salts from government custody and peddling them for his own considerable profit. Synthetic cathinones, or "bath salts," are similar to methamphetamine, ecstasy, or cocaine, and they are toxic and dangerous substances. According to the Drug Enforcement Administration and National Institutes of Health, bath salts are harmful, mind-altering substances that can lead to confusion, agitation, paranoia, hallucinations, aggression, and psychosis.[2] They can also cause harmful physical effects such as heart palpitations, hypertension,

---

[2] *See* Drug Enf't Admin., *Drug Fact Sheet: Bath Salts* (Dec. 2024), https://www.dea.gov/sites/default/files/2025-01/Bath-Salts-2024-Drug-Fact-Sheet.pdf; Nat'l Inst. on Drug Abuse, Nat'l Insts. of Health, *Synthetic Cathinones ("Bath Salts")* (July 2023), https://nida.nih.gov/research-topics/synthetic-cathinones-bath-salts.

and hyperthermia, as well as death from overdose.[3] In addition, use of bath salts is associated with increased potential for violence among an already volatile population of drug abusers.[4] As with other addictive drugs, many abusers may want to stop but feel powerless to do so, and so their dealers profit off the pain and misery of these captive customers. The Sentencing Guidelines rightly contemplate that the sale of significant quantities of bath salts deserves a substantial period of incarceration. Additionally, the defendant's agreed-upon advisory guideline calculation does not include the unknown substance that the conspirators gave the informant on several occasions, Cole's solicitation of three kilograms of bath salts from Kentucky, or the bath salts that Cole and Kindle sold prior to 2024.

The defendant's crimes went beyond drug trafficking. They were also public corruption offenses. The defendant abused the authority entrusted to him as a law enforcement officer and perverted it to his own ends. By stealing drugs that were in government evidence lockers, the defendant tainted legitimate law enforcement investigations, jeopardizing the government's ability to pursue justice in those cases. Not only would the drug evidence be unavailable for potential trials, but the defendant's corrupt actions raise doubts about his credibility that could call all his investigations into question. With his actions, the defendant erased the good work done by himself and his colleagues, putting drugs back on the street and undermining the trust in law enforcement necessary to combat crime effectively.

---

[3] *See* sources cited *supra* note 2.

[4] Michelle E. John, Crystal Thomas-Rozea & David Hahn, *Bath Salts Abuse Leading to New-Onset Psychosis and Potential for Violence*, Clinical Schizophrenia & Related Psychoses, Summer 2017, at 120, https://www.clinicalschizophrenia.net/articles/bath-salts-abuse-leading-to-newonset-psychosis-and-potential-for-violence.pdf.

Given the facts described above, the defendant's conduct was more serious than a garden-variety drug crime. Therefore, a substantial sentence of incarceration must still be imposed to reflect the nature and circumstances of the offense.

*b. History and Characteristics of the Defendant*

The defendant has no criminal history, has a college education, and was gainfully employed as an HSI Special Agent for over a decade. However, the defendant's history and his status as a federal law enforcement officer do not mitigate, but rather magnify, the seriousness of his crimes. He was not somebody who desperately needed money and had no other way to support his family. He was not someone who did not understand the harms caused by drugs; in fact, he made his living by ostensibly fighting drug trafficking. The defendant's offense was not a momentary lapse in judgment in an otherwise blameless life but rather a carefully orchestrated scheme that took place over a period of months and even years. He had numerous chances to reconsider the morality of what he was doing and put an end to it. Plainly, the defendant should have known better.

*c. Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence*

As stated, the offense was serious. It therefore merits serious punishment. Promoting respect for the law requires that those who enforce the law be held to the highest standard when they violate it. Having lost his badge and career, the defendant is unlikely to be in a position to commit the same crimes he committed here again. But the need for deterrence goes beyond the individual. The Court must ensure that anyone who is entrusted with the authority of a federal law enforcement officer knows the serious consequences of breaching that trust.

*d. Need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct*

On August 13, the Court imposed a sentence of 87 months of incarceration on Cole, the defendant's co-conspirator. This was consistent with the government's recommendation and within Cole's advisory guideline range, based on his Total Offense Level of 27. The difference in the advisory guideline ranges for Cole and Kindle is primarily due to their differing roles in the conspiracy.

The government's evidence, including the conversations captured during the controlled purchases, interviews with the conspirators' HSI colleagues and information provided by the confidential informant, suggests that Cole was the leader and primary driver of the scheme. Cole was known among his colleagues to be particularly adept at recruiting confidential informants and getting them to do his bidding. It was Cole who recruited the informants who the conspirators used to sell bath salts on their behalf and enlisted them in the scheme. Cole was primarily responsible for dealing with the informants, with the defendant filling in when Cole was out of town or otherwise unavailable.

Cole was also more proactive in procuring additional sources of supply of drugs for the conspiracy. While the defendant, as evidence custodian, played an important role in obtaining bath salts from HSI evidence lockers in Salt Lake City, Cole used his creativity and law enforcement connections to obtain additional drugs from around the country. The main driver of the conspirators' differing offense levels, and therefore their different Guideline recommendations, is the three kilograms of bath salts that Cole solicited from agents in Kentucky shortly before the conspirators were arrested. Cole was captured in a recorded conversation with the informant discussing his attempts to obtain pentedrones – a substance similar to cathinones in the bath salt "family" –and additional investigation confirmed that a package of these drugs was sent from

agents in Kentucky destined for Cole in Utah. The parties agree that Cole's solicitation in the drug quantity should not be attributable to the defendant, resulting in a lower overall offense level.

## CONCLUSION

For the foregoing reasons, the United States recommends a sentence at the high end of the applicable guidelines range. Such a sentence would be sufficient, but not greater than necessary to achieve the purposes of sentencing.

DATED this 15th day of October, 2025.

                                        EDWARD P. SULLIVAN
                                      Acting Chief, Public Integrity Section
                                      U.S. Department of Justice

                                      /s/
                                      Alexander Gottfried
                                      Trial Attorney

## CERTIFICATE OF SERVICE

I certify that I am an employee of the United States Department of Justice. A copy of this **UNITED STATES' SENTENCING MEMORANDUM** was served upon counsel of record, via electronic mail.

DATED this 15th day of October, 2025

                                      */ s / Alexander Gottfried*

                                      ALEXANDER GOTTFRIED
                                      Trial Attorney